**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. PJM 22-231** |
| | : | |
| JALEN CRAIG MCMILLAN, | : | |
| | : | |
| Defendant. | : | |
| | : | |

ooooOoooo

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendant was a corrupt bank employee who facilitated a sophisticated scheme to defraud Navy Federal Credit Union ("NFCU")—his employer. The Defendant was one of the scheme's key components, an insider, and on February 16, 2024, a jury of his peers swiftly found him guilty of all counts presented to them. The Defendant was found guilty of one count of bank fraud conspiracy, three counts of bank fraud, and one count of aggravated identity theft. Sentencing is presently scheduled for June 5, 2024, at 2:30 p.m.

As set forth below, the Government requests that the Court sentence the Defendant to a total sentence of **81 months of imprisonment** broken down as follows: concurrent sentences of 57 months' imprisonment as to Counts One, Two, Five, and Six, with the statutorily mandated term of 24 months' imprisonment for Count Eleven then applied consecutively.

**FACTS**

The evidence at trial was overwhelming and conclusively proved that beginning in June 2018 and continuing through March 2020, the Defendant conspired with Archie Paul, Jovan Bell, John Washington, Tiffany Williams, and others to defraud the NFCU of over $400,000.

The evidence showed that the conspiracy to defraud was organized, sophisticated, and was ultimately successful because each member of the conspiracy played a very specific role. Paul

obtained and used fictitious and stolen personal identifying information ("PII") of real persons (the "victims"). He worked with Washington and others to manufacture fraudulent identification documents displaying the PII of the victims, but photographs of individuals who were conspirators. On some occasions, Paul himself used the false identification documents to impersonate the victims, to open bank accounts, to have monies fraudulently obtained and deposited in those accounts, and ultimately steal those monies from NFCU.

The Defendant and Bell used their positions of trust with NFCU as member service representatives ("MSR") to facilitate both the opening of bank accounts in the name of the victims and subsequent financial transactions that resulted in actual losses to NFCU. The Defendant and Bell not only communicated with Paul prior to each fraudulent transaction but they also coordinated with each other to ensure that the fraudulent transactions were successful.

In addition to transactions committed by co-conspirators, the evidence at trial also proved that the Defendant was personally involved in at least six different fraudulent transactions, identified below.

### 1.  Zion Davis Account (Count 2)

On June 15, 2018, Paul opened a NFCU bank account using a fictitious identity, "Zion Davis". Text communications between Paul and the Defendant showed them planning the transaction two weeks earlier, beginning on May 31, 2018. Trial Ex. D2. On June 15, 2018, these communications were specific and orchestrated, down to the timing of when Paul should enter the bank so that the Defendant would be the one assisting him. *Id*. Further, text communications between Paul and the Defendant also showed the pair exchanging the name of Kelly Capuano, a victim, so Paul would know what to say in case a banking associate asked for the identity of his sponsor. *Id*.

These communications were corroborated by the bank records, which showed that the

Defendant and Paul did what they agreed to do. Bank records showed that the Defendant in fact opened the Zion Davis account for Paul. The bank records also showed that the Defendant and Paul used the name and access number of Kelly Capuano to open the account. *Id*.

Paul subsequently used the Zion Davis account to deposit a fraudulent check in the amount of $22,324.56. *Id*.

### 2. Matthew Fordham Account

On July 28, 2018, Paul opened a NFCU bank account using the real identity of Matthew Fordham. Bank records showed that the Defendant had opened this account, and once again used Kelly Capuano's name and access number to do so. Trial Ex. D3. Text communications between Paul and the Defendant showed them coordinating beforehand. *Id*. For instance, on July 28, 2018, at approximately 9:41 a.m., Paul messaged the Defendant, "Be there by 10:15." At 9:59 a.m., the Defendant responded, "I'll tell u when to slide in," and at 10:04 a.m., the Defendant wrote, "Come on." *Id*.

Two minutes later at 10:06 a.m., bank surveillance captured Paul and the Defendant sitting across from each other engaging in the transaction. *Id*. Bank records also showed that the Defendant successfully opened the account for Paul under Fordham's identity, and then used Fordham's personal information to apply for a $15,000 consumer loan, which was approved. *Id*. In addition, like the Zion Davis account, Kelly Capuano's information was again used to sponsor the opening of the account. *Id*. The Defendant then withdrew all $15,000 in cash and gave it to Paul.

The Court will recall that Mr. Fordham was a witness at trial.

### 3. Patrick Johnson Account

Communications between Paul and the Defendant revealed that on October 18, 2019, the Defendant messaged Paul expressing an interest in making some money through fraud. Trial Ex.

D4 ("Dang where the money lives at."). On October 21, 2019, Paul replied with the name "Patrick Johnson" and indicated that an individual impersonating Patrick Johnson would be using a North Carolina driver's license. *Id*. As per their practiced routine, this transaction was also orchestrated between Paul and the Defendant, with the Defendant providing Paul with instructions to relay to the co-conspirator entering the bank. *Id*. Specifically, the Defendant instructed Paul to tell the co-conspirator to say that he was interested in opening a business account with the Defendant. *Id*.

Consistent with the text exchanges, bank records showed that on October 21, 2019, the Defendant opened a NFCU bank account under the identity of Patrick Johnson. Records also showed that once the account was opened, the Defendant used the account to apply for a $23,000 consumer loan, which was approved. *Id*. The loan proceeds were then immediately withdrawn in cash.  Following this transaction, text communications between Paul and the Defendant showed that they met so that the Defendant could receive his cut. *Id*.

Patrick Johnson was a victim, and testified at trial.

### 4.  Felicia Franco Account (Counts 5 and 11)

On October 25, 2019, text communications showed that Paul sent Washington the PII of Felicia Franco, a real person, to have a fraudulent driver's license manufactured. Trial Ex. D5. On November 2, 2019, text communications between Paul and the Defendant showed that the Defendant messaged Paul, "Her grandfather sponsoring her Alexander Oduro access [Access Number]." *Id*. The evidence showed that the Defendant provided this information in advance of the fraudulent transaction that was going to take place that day.

NFCU bank records showed that on November 2, 2019, an account was opened under the identity of Felicia Franco and that Alexander Oduro was used as the sponsor on the account. *Id*. Bank records also showed that on or prior to November 2, 2019, and in furtherance of the scheme to defraud, the Defendant used his special access to NFCU's customer database to access

Alexander Oduro's account and obtain his banking information. *Id.* Both Felicia Franco and Alexander Oduro testified at trial, and both stated that they neither knew each other nor provided anyone with permission to use their information.

Following the account creation, the Defendant assisted the co-conspirator, who had been sent into the bank at Paul's direction, in applying for a $10,000 consumer loan in Felicia Franco's identity. *Id.* The loan was approved, and the funds were immediately withdrawn in cash.

### 5. Alexander West Account

On January 31, 2020, text communications between Jovan Bell and Paul showed the planning of another fraudulent transaction. *See* Trial Ex. D6. Text communications showed that Bell had messaged Paul, "I recently got a contract as a dod contractor at NIH for data analyst," in response to a photograph of a Georgia driver's license bearing Paul's photograph but the personal identifiable information of Alexander West, a real person. Trial Ex. D6.

Bank records showed that Paul then called the NFCU's call center to open an account using Alexander West's identity, with the pretextual false eligibility information Jovan Bell had provided. *Id.* Paul's attempt, however, to open the account over the phone was unsuccessful, and Paul was required to go to the bank to provide additional information. *Id.* Text communications showed Bell assuring Paul that, "jalen just gone have to approve it." *Id.*

On January 31, 2020, at approximately 1:16 p.m., text communications showed that Paul messaged Bell the name "Alexander West," and Jovan Bell responded, "As long as jalen saw you you're good."

NFCU bank records show that on January 31, 2020, at approximately 2:06 p.m., the Defendant opened a bank account under West's identity.

Jovan Bell testified at trial against the Defendant. With respect to this fraud transaction, Bell recounted coordinating with the Defendant to ensure that the account would be opened

without complications.

A loan was subsequently submitted in the amount $18,000 but was denied. Alexander West also testified at trial.

### 6. Emily Myers Account (Count 6)

Text communications and bank records showed that on March 24, 2020, Co-conspirator Tiffany Williams opened a bank account telephonically with NFCU using Emily Myers's PII. Trial Ex. D7a. She then applied for and obtained a $65,000 auto loan in Emily Myers's name, which was deposited into the fraudulent account. *Id*. Williams then recruited another co-conspirator to impersonate Emily Myers, providing her with a driver's license bearing Emily Myers's PII. Williams then arranged to meet the co-conspirator at the NFCU Glenarden branch.

NFCU bank surveillance video captured the co-conspirator entering the Glenarden branch, identifying herself as Emily Myers, and presenting a driver's license in the name of Emily Myers to James Johnson, a bank employee. *See* Trial Ex. D7a. The co-conspirator asked to withdraw the $65,000 that had been deposited in the account the day before. However, Mr. Johnson was suspicious of the identification presented and raised the issue of potential fraud with his supervisors. Noticing the heightened scrutiny, the co-conspirator fled the bank without being able to withdraw the $65,000 from the Emily Myers account.

After this failed attempt, Williams messaged Paul to express her intention to make a second attempt to obtain the $65,000 using the Emily Myers's identity. *See* Trial Ex. D7b. To improve her chances of success, she requested the aid of Paul's bank insider to make this second fraudulent attempt. Paul agreed but with a warning, "Tiffany I let you use my inside .. im let you know right now .. no funny business .. im cool with that cut you said … but no funny business." *Id*. Paul then sent Williams the address to the Laurel branch of the NFCU. *Id*. Williams, in turn, informed Paul that she would be presenting herself as Emily Myers so that Paul could pass the information to the

Defendant. The evidence showed that Paul did so, messaging the Defendant that Williams was on her way posing as Emily Myers. *Id*.

Bank surveillance video confirms that on March 25, 2020, approximately at 2:06 p.m., Williams entered the Laurel branch and, unsure who Paul's bank insider was, went to bank teller, Leonard Awanda. The Defendant was working that day but was assigned as a Greeter, stationed at the door to let people in and out of the branch per COVID protocols. The Defendant informed Paul that Williams had gone to another person and both remained hopeful that the transaction would go through.

Williams presented a driver's license bearing Emily Myers's information with her photograph to Mr. Awanda and requested a cash withdrawal of the $65,000 loan that had been approved. *Id*. Looking at the driver's license and the details of the requested transaction, Mr. Awanda suspected fraud. As the wait for the cash stretched out over the next 30 minutes, Paul remained in communication with Williams, while simultaneously exchanging messages with the Defendant. *Id*. The records admitted at trial included screenshots from Paul of his exchanges with the Defendant to Williams. *Id*. This was done to help Williams navigate the difficult circumstances that she found herself in. Law enforcement was eventually contacted, and the Defendant was informed of this development. As soon as the message had been communicated to him by supervisors, the Defendant messaged Paul for Williams to "dip now." *Id*. As the surveillance footage shows, as soon as she received that message, Williams fled the bank. *Id*.

Emily Myers is a real person and testified at trial about the use of her PII in this scheme.

### Obstruction of Justice

On May 13, 2020, a black Apple iPhone, used in furtherance of the conspiracy, was seized from the Defendant and searched pursuant to a search warrant. Law enforcement discovered dozens of communications between the Defendant and his co-conspirators detailing his role in the

scheme, including receipt of $2,000 kickbacks for facilitating the fraudulent transactions for Paul.

At trial, the Court heard testimony that after the Defendant's phone was seized by law enforcement on May 13, 2020, the Defendant contacted Jovan Bell and instructed Bell to wipe his phone to destroy any evidence that may be stored on his device. The Defendant and Bell then met later that evening and discussed the risks that they both faced in the ongoing investigation. They tried to identify the commonly used software by law enforcement to analyze cellular/mobile devices for evidence. Further, to make sure that their narratives were consistent, the Defendant and Bell also discussed what they would say to investigators if they were interviewed about their criminal activities.

### THE APPLICABLE SENTENCING GUIDELINES

The Government and the U.S. Probation Office ("USPO") agree that the following guidelines apply to Counts One, Two, Five, and Six:[1]

- Base offense level = **7** ( U.S.S.G. §§ 2X1.1(a); 2B1.1(a)(1))
- + **12** because the offense involved loss more than $250,000 but less than $550,000 (U.S.S.G. § 2B1.1(b)(1)(G))
- + **2** because the offense involved at least 10 victims (U.S.S.G. § 2B1.1(b)(2)(A))
- + **2** because the Defendant abused a position of private trust (U.S.S.G. § 3B1.3)
- + **2** because the Defendant obstructed justice (U.S.S.G. § 3C1.1).

The Government submits that the following enhancement applies:

- + **2** because the offense otherwise involved sophisticated means and the Defendant intentionally engaged in or caused conduct constituting sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)).

The Government disagrees that the following enhancement applies:

- + **2** because the offense involved the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of another means of identification (U.S.S.G. § 2B1.1(b)(11)(C)(ii)).[2]

---

[1] The Defendant has not filed objections to the Presentence Report ("PSR").

[2] According to U.S.S.G. § 2B1.6, Application Note 2, enhancements for the "transfer, possession, or use of a means of identification" do not apply when a sentence for aggravated identity theft is

The Government and the USPO agree that as to Count 11, the guideline sentence is the term of imprisonment required by statute, which is a consecutive sentence of 24 months' imprisonment. (U.S.S.G. § 2B1.6; 18 U.S.C. § 1028A).

## I.    **The Loss Enhancement**

To determine the appropriate loss enhancement under the Sentencing Guidelines, the Court may consider both the loss caused by the offenses of conviction as well as the relevant conduct of the defendant that resulted in loss. U.S.S.G. § 1B1.3; *United States v. McLean*, 715 F.3d 129, 144 (4th Cir. 2013). The district court "need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n. 3(C), based on a preponderance of the evidence. *United States v. Savage*, 885 F.3d 212, 226-28 (4th Cir. 2018) (approving sentence based on reasonable estimate of "intended loss"); *McLean*, 715 F.3d at 144 (*citing United States v. Mehta*, 594 F.3d 277, 282 (4th Cir.2010)). Because the traditional rules of evidence are not applicable to sentencing proceedings, Fed.R.Evid. 1101(d)(3), the sentencing court may consider any "relevant information ... [that] has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). "'[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.'" *United States v. Halstead*, 261 Fed. Appx. 472, 475 (4th Cir. 2008) (*citing United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003) (citing U.S.S.G. § 2F1.1, cmt. n. 9)).

The Sentencing Guidelines make clear that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A). "Intended loss" refers to the pecuniary harm that the defendant purposely sought to inflict. U.S.S.G. § 2B1.1, cmt. n. 3(A)(ii).

As set forth in the below spreadsheet, and as supported by the declaration of Analyst Kropff

---

imposed, which it will be here.

(Attachment A), the resulting intended loss was approximately **$420,324.64**, and the resulting actual loss was approximately **$165,891.68**. To determine this loss figure, the government first identified the fraudulent bank accounts that were opened by the conspiracy, including those that the Defendant personally opened, and then identified the financial transaction executed using those accounts. Those bank accounts include:

| Account Holder | Real Person | Account Opening Date | Transaction Amount | Charged Conspirator(s) |
|---|---|---|---|---|
| Zion Davis | No | June 15, 2018 | $22,324.56 | Archie Paul<br>*Jalen McMillan* |
| Matthew Fordham | Yes | July 28, 2018 | $15,000.00 | Archie Paul<br>*Jalen McMillan* |
| Jasmine Jamison | Yes | Oct. 3, 2019 | $0.00 | Archie Paul<br>Tiffany Williams<br>Jovan Bell |
| Carter Hill | No | Oct. 9, 2019 | $75,000.00 | Archie Paul<br>Jovan Bell |
| Gretchen Mock | Yes | Oct. 18, 2019 | $25,000.00 | Archie Paul<br>Jovan Bell<br>John Washington |
| Patrick Johnson | Yes | Oct. 21, 2019 | $23,000.00 | Archie Paul<br>*Jalen McMillan* |
| Amanda Steinbach | Yes | Oct. 23, 2019 | $15,000.00 | Archie Paul<br>Tiffany Williams<br>Jovan Bell<br>John Washington |
| Jeffrey Taylor | Yes | Oct. 26, 2019 | $25,000.00 | Archie Paul<br>John Washington |
| William Akard | Yes | Oct. 26, 2019 | $23,000.00 | Archie Paul<br>John Washington |
| Danielle Redmon | Yes | Oct. 28, 2019 | $21,000.00 | Archie Paul<br>Tiffany Williams |
| Felicia Franco | Yes | Nov. 2, 2019 | $10,000.00 | Archie Paul<br>*Jalen McMillan*<br>John Washington |
| Brett Galloway | Yes | Nov. 4, 2019 | $17,000.00 | Archie Paul<br>Jovan Bell |
| Ellen Stark | Yes | Dec. 20, 2019 | $25,000.00 | Archie Paul<br>Tiffany Williams<br>Jovan Bell |
| Amanda Starks | Yes | Dec. 25, 2019 | $22,000.00 | Archie Paul |
| Hayley Bryan | Yes | Dec. 30, 2019 | $19,000.00 | Archie Paul |
| Alexander West | Yes | Jan. 31, 2020 | $18,000.00 | Archie Paul<br>*Jalen McMillan* |

| | | | | Jovan Bell |
|---|---|---|---|---|
| Aaron Hill | No | Mar. 12, 2020 | $0.00 | Tiffany Williams |
| Emily Myers | Yes | Mar. 25, 2020 | $65,000.00 | Archie Paul *Jalen McMillan* Tiffany Williams |

Accordingly, based on a preponderance of the evidence, the reasonable estimate of loss in this case is between $250,000 and $550,000.

## II.    **The Victim Enhancement**

U.S.S.G. § 2B1.1(b)(2)(A)(i) provides for a 2-level enhancement if the offense involved 10 or more victims. Application Note 1 defines "Victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)."[3] As set forth above, NFCU sustained an actual loss of approximately $165.891.68 as a result of the Defendant's offense.

In addition, Application Note 4(E) provides that in a case involving means of identification, "victim" includes "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1, App Note 4(E). As such, in addition to the NFCU, who suffered actual loss, the fifteen (15) identity theft victims noted in the above chart are victims that are accounted in the ten (10) or more victim calculation.

Accordingly, both NFCU and the identity theft victims are "Victims" and support a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A).

## III.    **The Sophisticated Means Enhancement**

U.S.S.G. § 2B1.1(b)(10)(C) provides for a 2-level enhancement if the "offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Application Note 9(B) clarifies that the enhancement is appropriate when the offense involved "especially complex or especially intricate offense conduct

---

[3]  Application Note 1 defined "Person" to include "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."

pertaining to the execution or concealment of an offense." While the enhancement requires more than "the concealment or complexities inherent in fraud," *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014), a defendant need "not utilize the most complex means possible to conceal his [criminal] activit[y]." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012).  "The court need only find the presence of efforts at concealment that go beyond (not necessarily far beyond ...) the concealment inherent in ... fraud." *Id.* (internal quotation marks omitted).

Ultimately, the enhancement is to be applied "when there is proof of complexity beyond the 'minimum conduct required to establish a violation of [the applicable statute] in its simplest form.'" *United States v.* Savage, 885 F.3d 212, 228 (4th Cir. 2018) (quoting *Adepoju*, 756 F.3d at 257 (alterations in Savage) (emphasis added)).

Further, the Fourth Circuit has recognized that a sophisticated scheme can be the sum of unsophisticated parts. For instance, as the Circuit noted in *Jinwright*, "[a] sentencing court should consider the cumulative impact of the criminal conduct, for the 'total scheme' may be 'sophisticated in the way all the steps were linked together.'" 683 F.3d at 486. Accordingly, "[t]he enhancement applies where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated." *Adepoju*, 756 F.3d at 257; *United States v. Merilia*, 640 F. App'x 239, 241 (4th Cir. 2016) ("[A] defendant's individual actions need not be sophisticated; what matters is the sophistication of the scheme as a whole.").

Here, there is no question that the offense—when considered in its entirety—was sophisticated. The scheme involved obtaining stolen identity information, having false documents made using those identities, recruiting individuals to impersonate the identities, coordinating with bank insiders, meeting with the bank insiders, and opening over a dozen accounts using false identities and information. *See United States v. Vysniauskas*, 593 F. App'x 518, 531-32 (6th Cir. 2015) (affirming application of sophisticated means enhancement where the defendant set up

dozens of bank accounts at several financial institutions and stole real identification information and forged identification documents, among other actions, as part of the scheme) (internal quotation marks omitted). The scheme went above and beyond what is ordinarily required to commit bank fraud and continued over an extended period.

Moreover, there are several aspects of the conspiracy that are independently sufficient to support the sophisticated means enhancement. *First*, the repetition of the scheme across multiple accounts for a period of nearly two years demonstrates the scheme's sophistication. *See United States v. Laws*, 819 F.3d 388, 393 (8th Cir. 2016) ("[T]he sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place."). As proven at trial and supported by Analyst Kropff's declaration, the scheme was executed over a dozen times with a considerable amount of coordination and communication.

*Second*, the scheme used false and stolen identities and manufactured false documents to perpetrate the fraud, which is alone sufficient to merit the sophistication enhancement. A host of cases hold accordingly. *See e.g., United States v. Merilia*, 640 F. App'x 239, 241 (4th Cir. 2016) (finding sophisticated means where defendant and his coconspirators "caused debit cards to be issued so that their names would not appear on checks, transferred funds between the debit cards, and used false identities to further their scheme"); *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015) (affirming the district court's application of the sophisticated means enhancement where a defendant "used multiple aliases, obtained false state identification cards in two states to support those aliases, and then used those aliases to obtain fraudulent cards on victims' accounts"); *United States v. Duell*, 463 F. App'x 214, 215 (4th Cir. 2012) (affirming application of two-level sentencing enhancement for sophisticated means in securities and wire fraud case in part because defendant created false financial statements and forged signatures); *see also United States v. Davis*,

753 F. App'x 154, 156–57 (4th Cir. 2018) (affirming application of two-level sentencing enhancement for sophisticated means in mail fraud case in part because defendant "used numerous means to conceal the fraud, including forgery [and] altering documentation"); *United States v. White*, 850 F.3d 667, 675–76 (4th Cir. 2017) (affirming application of two-level sentencing enhancement for sophisticated means in false tax preparer case in part because defendant created a fictitious entity, created fraudulent IRS notices, and forged signatures); *United States v. Adejumo*, 772 F.3d 513, 531 (8th Cir. 2014) (affirming the district court's application of the sophisticated means enhancement where the defendant had identification documents, specifically created with his picture on them, and benefitted from his co-conspirator's activities in creating fake identification documents to assist him in the scheme).

Finally, the Defendant's own conduct was sophisticated because he used his special access to NFCU's database to open false bank accounts and then apply for loans. Further, the Defendant accessed Alexander Oduro's closed bank account to obtain the access number and used it to open a false account under the identity of Felicia Franco. What's more, the Defendant was thoughtful enough to access and use information from a closed bank account to conceal the fraud. These actions go beyond the minimal conduct needed to commit the offense and constitute sophisticated means.

Accordingly, a 2-level enhancement for sophisticated means appropriately applies.

## IV.    **The Role Enhancement**

U.S.S.G. § 3B1.3 provides for a 2-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. For the enhancement to apply, Application Note 1 states that "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense."

Here, the Defendant abused his position as a MSR with the NFCU to knowingly open fraudulent accounts and used those accounts to further commit fraud against his employer. In addition to guidance that allowed the conspirators to evade security systems in place, the Defendant performed a variety of financial transactions himself that allowed this scheme to succeed. This included opening bank accounts, processing loans, passing PII from files for account sponsors, and acting as a safety net for Jovan Bell.

Ironically, the Defendant was trained to be a part of the bank's primary line of defense against fraud and held a duty to alert the bank of any suspected fraudulent transactions. Instead, McMillan worked as a covert operative for a group of fraudsters, helping them overcome the safeguards of the bank for a cut of the proceeds. For instance, McMillan used his position to override fraud safeguards by personally processing the Alexander West account that Paul unsuccessfully tried to open over the phone. As the evidence at trial showed, after Paul informed Bell that the account was "blown," Bell told Paul that he would need to physically come to the bank and that "jalen just gone have to approve it." As confirmed by the evidence the government submitted at trial, Paul came to the bank that same day and the Defendant approved the Alexander West account within an hour. A substantial reason this scheme worked was the Defendant's abuse of his position.

In addition, the Defendant abused his position by accessing customer banking information to both open and legitimize the fraudulent bank accounts. For instance, in the Felicia Franco transaction, the Defendant accessed the Alexander Oduro's bank account information from the NFCU database to obtain Oduro's identification number. This act served as the basis for McMillan's conviction for aggravated identity theft. Without question, McMillan's willingness to abuse his position and breach the bank's trust, contributed to the success of the scheme and the fraudulent transactions.

As such, based on the totality of the Defendant's conduct, the 2-level role enhancement appropriately applies.

## V.   **The Obstruction of Justice Enhancement**

U.S.S.G. § 3C1.1 provides for a 2-level enhancement if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction." The Application Notes provide examples of covered conduct, which "sets forth examples of the types of conduct to which this adjustment is intended to apply." Note 4 provides examples of covered conduct, including "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding, or attempting to do so."

The Defendant's behavior fits squarely within this example of covered conduct. At trial, Jovan Bell testified that after the Defendant's phone had been seized on May 13, 2020, the Defendant contacted Bell and alerted/guided him to wipe his phone in order to destroy any evidence that may be stored on his device. Bell followed the Defendant's instruction and wiped his phone, resulting in the destruction of material evidence that included text messages, call history, contact lists and geo-location information. Accordingly, the Defendant conduct is a quintessential example of obstruction, and the 2-level enhancement for obstruction of justice should apply.

## VI.   **Final Adjusted Guidelines Range**

The Government's position as to the final guidelines calculation is as follows:

- Base offense level = **7** ( U.S.S.G. §§ 2X1.1(a); 2B1.1(a)(1))
- + **12** because the offense involved loss more than $250,000 but less than $550,000 (U.S.S.G. § 2B1.1(b)(1)(G))
- + **2** because the offense involved at least 10 victims (U.S.S.G. § 2B1.1(b)(2)(A))
- + **2** because the offense involved sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C))

- + **2** because the Defendant abused a position of private trust (U.S.S.G. § 3B1.3)
- + **2** because the Defendant obstructed justice (U.S.S.G. § 3C1.1).
- = **27** (Final Adjusted Offense Level).

The Government agrees that the Defendant is a Criminal History Category I, and that he is a Zero-Point offender under U.S.S.G. § 4C1.1, resulting in a 2-level decease. As such, the Government's calculation of the Defendant's advisory guidelines range as to Counts One, Two, Five, and Six is 57 – 71 months; this is followed by a mandatory 24 months as to Count Eleven, for a total range of **81 – 95 months of imprisonment**. Based on this tentative calculation, the Government is seeking a guidelines sentence of **81 months of imprisonment**.

## THE SECTION 3553(a) FACTORS

Section 3553(a) requires that the Court impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in the statute. The court, in determining the particular sentence to be imposed, is obligated to consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. The government will address all of these factors at the sentencing hearing but addresses some of them below.

    a.    <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>

As the evidence proved in this case, the Defendant used his position of trust in the NFCU to victimize his employer and place in harm's way multiple innocent individuals. The Defendant was hired and trained to be an honest steward of the bank and to protect the money that it managed on behalf of its members. He willfully chose to do the opposite, jeopardizing the financial security of innocent people like Matthew Fordham, Felicia Franco, Alexander Oduro, Patrick Johnson, and Alexander West, all of whom the Court heard from at trial. The Defendant not only profited from his deceit, but he made the fraud harder to detect by working from the inside and using customer

Page 17 of 21

information to open and legitimize fraudulent bank accounts. As the evidence showed, the Defendant was a member of a sophisticated bank fraud scheme that spanned nearly two years and attempted to obtain, by fraud, more than $400,000. The fact that the scheme only successfully obtained approximately $160,000 is not because McMillan and his co-conspirators didn't try or didn't want to.

What's more, in light of a looming federal investigation, McMillan then went out of his way to obstruct justice by persuading Jovan Bell, his fellow bank insider, to wipe his phone and destroy evidence. The Defendant was successful in causing the destruction of evidence in Bell's phone but, despite his efforts, his elaborate scheme was uncovered because law enforcement had seized cellphones belonging to his co-conspirators. Presently, just days away from sentencing, the Defendant has yet to accept responsibility or acknowledge the deceit that he has perpetrated. This is troubling and speaks to the need to impose a serious sentence to impart the seriousness of the offense to the Defendant.

The Defendant's role and offense conduct in this conspiracy is only exceeded by its leader, Archie Paul. Both the Defendant and Paul started the scheme together in June 2018, with the Zion Davis account, and were together when the scheme unraveled in March 2020, with the arrest of Williams as she tried to commit fraud with the Emily Myers account. Without the Defendant, it's unlikely that Paul's scheme would have started or succeeded. The Defendant's role provided the proof-of-concept that Paul needed to recruit and convince others to join them.

Therefore, an 81-month sentence is warranted in this case.

b.   The Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant

A significant term of imprisonment is needed to deter the Defendant from future crimes and, perhaps even more important, protect the public from his future crimes. That McMillan faces a high Guidelines range is both appropriate and "evinces Congress' purpose to curb judicial

leniency in white collar crime cases." *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022). A significant sentence will send the message that any crime that places innocent people in jeopardy and preys on the vulnerabilities of banks will receive sentences that are commensurate with the harm that they cause.

A long sentence will further serve the purposes of specific deterrence because the Defendant has refused to accept responsibility or acknowledge his wrongdoing. In order to ensure that he cannot victimize other individuals and businesses, the Defendant must be imprisoned for an extensive period of time.

A long sentence will also further the goal of general deterrence. Long sentences in these types of white-collar cases are particularly appropriate because "white-collar criminals act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity. They are, therefore, prime candidates for general deterrence." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (citations and internal quotations marks omitted); *see also United States v.* Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citations and internal quotation marks omitted); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (same).

Considering all of the Section 3553(a) factors, 81 months of imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing.

## RESTITUTION

The Mandatory Victim Restitution Act ("MVRA") provides for mandatory restitution to the victims of certain identified offenses, including health care fraud. 18 U.S.C. § 3663A (MVRA applies "in all sentencing proceedings for convictions of…any offense…in which an identifiable victim or victims has suffered…pecuniary loss."). Specifically, the MVRA states that "the Court shall

order…that the defendant make restitution to the victim[s] of the offense….” 18 U.S.C. § 3663A(a)(1); U.S.S.G. § 5E1.1 (“In the case of an identifiable victim, the court shall – (1) enter a restitution order for the full amount of the victim's loss …”). Any dispute as to restitution shall be resolved by the Court by the preponderance of the evidence. 18 U.S.C. § 3664(e).

Here, the Government is seeking restitution of $165.891.68 to the Navy Federal Credit Union.   The Government respectfully requests entry of restitution in the above amount, which is to be joint and several with co-defendants Archie Paul, Tiffany Williams, Jovan Bell, and John Washington.

## CONCLUSION

For the foregoing reasons set forth in this memorandum and as will be set forth in greater detail at sentencing, the Government respectfully requests that the Court sentence the Defendant as follows:

- Impose of a total term of 81 months imprisonment, consisting of 57 months as to Count One (Bank Fraud Conspiracy) and Counts Two, Five, and Six (Bank Fraud), to be served concurrently with each other, and 24 months of imprisonment on Count Eleven (Aggravated Identity Theft), to be served consecutive to the sentence imposed on Counts One, Two, Five, and Six.

- Place the Defendant on supervised release for a period of 5 years as to Counts One, Two, Five, and Six, to be served concurrent with each other, and 1 year of supervised released on Count Eleven, to be served concurrent to Counts One, Two, Five, and Six.

- Order the Defendant to make restitution for the full amount of the losses caused by the Defendant, namely $165.891.68.

Respectfully submitted,

Erek L. Barron
United States Attorney

_____/s/_____
Bijon A. Mostoufi
Ranganath Manthripragada
Assistant United States Attorneys
6406 Ivy Lane, 8th Floor
Greenbelt, Maryland 20770
(301) 344-8135

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's motion was served via email

on the Defendant's counsel.

_____/s/_____
Bijon A. Mostoufi
Assistant United States Attorney